## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARON COLADONATO, on behalf of herself and all others similarly situated, | Civil Action No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| J. CREW GROUP, INC.; J. CREW OPERATING CORP.; J. CREW, INC.; J. CREW INTERNATIONAL, INC.; CHINOS HOLDINGS, INC.; CHINOS INTERMEDIATE HOLDINGS A, INC.; and CHINOS INTERMEDIATE HOLDINGS B, INC., | |
| Defendants. | |

Plaintiff Caron Coladonato, on behalf of herself and all others similarly situated, through her undersigned attorneys, files this class action Complaint against Defendants and alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this nationwide class action against Defendants alleging violations of federal and state pricing regulations, common law, and the consumer protection laws of New York and New Jersey.

2.      Specifically, it is alleged that Defendants engaged in a systematic scheme of false and misleading advertising, marketing, and sales practices with respect to the sale of apparel and other personal items via their online J. Crew Factory website and in their physical J. Crew Factory retail stores. This scheme, which is set forth in more detail herein, may be summarized as follows.

3.      With respect to their online J. Crew Factory website, Defendants had, and continue to have, a policy of setting an arbitrary "valued at" price for every item offered for sale, which purports to be the item's "original" or "regular" price. This practice is false and misleading

because no items are ever sold or offered for sale at this "valued at" price, but rather are always sold at a price that is lower than the "valued at" price.

4.      Further, Defendants perpetually held, and continue to hold, a series of "sales" on their online J. Crew Factory website that purport to discount, for a limited time, every item offered for sale by a certain percentage or amount.  For example, during a recent advertised "50% OFF EVERYTHING" sale, Defendants offered a shirt "valued at" $29.50 at a purportedly discounted price of "$14.99."  This practice is false and misleading because the advertised sale prices do not represent an actual "50% OFF" discount, as the items were never sold or offered for sale at their assigned "valued at" prices.

5.      Moreover, the purported sale price of $14.99 is not an actual "50% OFF" discount from the shirt's assigned "valued at" price of $29.50, as claimed by Defendants, but represents only a 49% discount off the "valued at" price.

6.      Finally, Defendants represented, and continue to assert, that their advertised online sale prices are available only for a limited time.  This practice is false and misleading because each "sale" is immediately followed by another similar sale, which results in the same or a very similar "discounted" price for each item on Defendants' website, regardless of the precise terms of each purported "sale."

7.      For example, the above-noted shirt, which was purportedly discounted to "$14.99" during the advertised "50% OFF EVERYTHING" sale on April 12, 2017, was also offered for sale at the identical price of $14.99 during an advertised "UP TO 50% OFF EVERYTHING" sale on April 10, 2017; at an "UP TO 60% OFF NEW ARRIVALS" sale on April 7, 2017; and at an "EXTRA 50% OFF CLEARANCE" sale on March 31, 2017.

2

8.      Defendants engage in similar false and misleading advertising, marketing, and sales practices in their physical J. Crew Factory retail stores.

9.      Specifically, each item offered for sale by Defendants in their retail stores has a price tag that sets forth a purported "original" or "regular" price that is identical to the arbitrary "valued at" price advertised on Defendants' website. Yet, like on the website, no item is ever sold or offered for sale at its ticketed price in Defendants' retail stores, but rather all items are always sold and offered for sale at prices that are lower than their ticketed prices.

10.     Further, as on their website, Defendants perpetually held, and continue to hold, a series of "sales" in their physical J. Crew Factory retail stores that purport to discount, for a limited time, every item in their stores by a certain percentage or amount. For example, during a recent in-store sale, Defendants advertised via several large placards "50% OFF EVERYTHING," and offered a shirt with a ticketed price of "$59.50' at purportedly discounted sale price of "$29.95." Like Defendants' online pricing policies, this practice is similarly false and misleading because the advertised sale prices do not represent an actual "50% OFF" discount, as the items were never sold or offered for sale at their ticketed prices in Defendants' retail stores.

11.     Moreover, the purported sale price of the above shirt is not even a full "50% OFF," as advertised, but is slightly less (approximately 49.66% off). Thus, even if the shirt were previously sold at the ticketed price of $59.50 – which it was not – the advertised discount and sale price would still be false and misleading.

12.     Because Defendants' sales – and their purported discounted sale prices – never end, but rather continue on a daily basis and are available anytime a customer visits Defendants' website or their retail stores, the purported sale prices are not actually discounted at all, but rather are the everyday, regular prices of the items.

3

13. Federal regulations prohibit the advertising of false, "phantom" price reductions and discounts off inflated, fictitious "regular" prices that never actually existed. See 16 C.F.R. § 233.1.

14. Moreover, the consumer protection laws and common law of all states, including New York and New Jersey, prohibit deceptive advertising, marketing, and sales practices, including advertising and selling items at purported discounts and offering price advantages that do not exist.

15. By advertising these limited-time discounts that were never actually provided to customers, and by selling items based on these non-existent discounts, Defendants have violated the state consumer protection laws of New York and New Jersey, as well as the common law and federal regulations, as set forth herein.

16. Plaintiff brings this lawsuit against Defendants to stop this unlawful practice, to recover for the class of customers of the J. Crew Factory website and retail stores the overcharges that they paid, and to obtain for customers the actual discounts they were entitled to receive but did not due to Defendants' deceptive practices.

## PARTIES

17. Plaintiff Caron Coladonato is an individual and a resident and citizen of New Jersey. During the class period, Plaintiff purchased goods from Defendants' online J. Crew Factory website and from Defendants' physical J. Crew Factory retail stores on numerous occasions, and suffered an ascertainable loss and monetary damages as a result of Defendants' unlawful conduct alleged herein.

18. Defendant J. Crew Group, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York,

4

New York 10003, and thus is a citizen of Delaware and New York. Defendant J. Crew Group, Inc. may be served with process by service upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

19.     Defendant J. Crew Operating Corp. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York, New York 10003, and thus is a citizen of Delaware and New York. Defendant J. Crew Operating Corp. may be served with process by service upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

20.     Defendant J. Crew, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York, New York 10003, and thus is a citizen of Delaware and New York. Defendant J. Crew, Inc. may be served with process by service upon its registered agent, Corporation Service Company, 830 Bear Tavern Road, Ewing, New Jersey 08628.

21.     Defendant J. Crew International, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York, New York 10003, and thus is a citizen of Delaware and New York. Defendant J. Crew International, Inc. may be served with process by service upon its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

22.     Defendant Chinos Holdings, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York, New York 10003, and thus is a citizen of Delaware and New York. Defendant Chinos Holdings, Inc. may be served with process by service upon its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

23.     Defendant Chinos Intermediate Holdings A, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York, New York 10003, and thus is a citizen of Delaware and New York. Defendant Chinos Intermediate Holdings A, Inc. may be served with process by service upon its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

24.     Defendant Chinos Intermediate Holdings B, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 770 Broadway, New York, New York 10003, and thus is a citizen of Delaware and New York. Defendant Chinos Intermediate Holdings B, Inc. may be served with process by service upon its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

25.     Upon information and belief, all Defendants have a parent-subsidiary relationship, in that Defendant J. Crew International, Inc. is a wholly-owned subsidiary of Defendant J. Crew, Inc., which is a wholly-owned subsidiary of Defendant J. Crew Operating Corp., which is a wholly-owned subsidiary of Defendant J. Crew Group, Inc., which is a wholly-owned subsidiary of Defendant Chinos Intermediate Holdings B, Inc., which is a wholly-owned subsidiary of Defendant Chinos Intermediate Holdings A, Inc., which is a wholly-owned subsidiary of Defendant Chinos Holdings, Inc.

26.     At all times during the relevant class period, Defendants together owned and operated, and continue to own and operate, more than 300 J. Crew and J. Crew Factory retail stores throughout the United States.  Defendants operate the J. Crew Factory retail stores out of their headquarters in New York, which operation entails, *inter alia*, the creation and implementation of

the advertising, marketing, and sales policies described herein, including the planning of in-store sales, design of advertising placards, and pricing of items.

27.     Defendants also own and operate the online J. Crew and J. Crew Factory retail websites, which advertise, market, and sell retail products in every state in the United States, including New York and New Jersey, and have done so throughout the relevant class period. Defendants operate the online J. Crew Factory website out of their headquarters in New York, which operation entails, *inter alia*, the creation and implementation of the advertising, marketing, and sales policies described herein, including the planning of website sales and the pricing and sale of items.

28.     Defendants created the policies and procedures described herein and, at all times during the relevant class period, participated in, endorsed, implemented, and performed the conduct alleged herein.

29.     Plaintiff specifically alleges that Defendants' advertising and marketing campaigns and their sales policies and practices relating to both their retail stores and website were created by Defendants at their principal place of business in New York, and were disseminated nationwide from New York. Accordingly, the unlawful acts and practices alleged herein originated in New York, and Plaintiff alleges that Defendants' marketing, advertising, and sale of merchandise from their retail stores and websites are governed by, inter alia, New York law, regardless of where in the United States the merchandise was purchased.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum of $5,000,000.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because Defendants were within the relevant class period, and continue to be, citizens of this district, in that the principal place of business for each Defendant is located in this district.   Moreover, Defendants regularly transacted and continue to transact business in this district, in that all items sold on Defendants' website are sold from this district.

32.     This Court has *in personam* jurisdiction over the Defendants because, *inter alia,* Defendants: (a) are headquartered in this district; (b) transacted business in this district; (c) maintained continuous and systematic contacts in this district prior to and during the class period; and (d) purposefully availed themselves of the benefits of doing business in this district. Accordingly, the Defendants maintain minimum contacts with this district which are more than sufficient to subject them to service of process and to comply with due process of law.

## FACTUAL ALLEGATIONS

33.     Defendants are each in the for-profit business of selling apparel and other personal items in their J. Crew and J. Crew Factory retail stores, as well as via their online J. Crew and J. Crew Factory retail websites.

34.     This lawsuit concerns Defendants' false and misleading advertising, marketing, and sales practices with respect to their illusory "sales" and "discounting" of items sold on their online J. Crew Factory website, www.factory.jcrew.com, and in their J. Crew Factory retail stores.

**Defendants' Online Sales Practices**

35.     One of the most effective techniques in advertising is for a seller to offer customers a reduction from either the seller's own former price for an item or the price at which the item or an equivalent item is sold by a competitor.

36.     This technique is widely used because sellers know the truth of the old adage

"everyone loves a bargain," and they understand that a product's "regular" price – the price at which a product is generally sold in the marketplace – matters to consumers.

37.     Indeed, numerous studies show that consumers are much more likely to purchase an item if they are told that it is being offered for sale at a discounted price that is less than the item's everyday, regular price, or that the item is worth more than the asking price.

38.     For example, a well-respected study by Dhruv Grewal & Larry D. Compeau entitled Comparative Price Advertising: Informative or Deceptive?, 11 J. of Pub. Pol'y & Mktg. 52, 55 (Spring 1992), concludes that **"[b]y creating an impression of savings, the presence of a higher reference price enhances [consumers'] perceived value and willingness to buy [a] product."**

39.     Numerous other articles and studies have reached the same conclusion. <u>See</u> Compeau & Grewal, Comparative Price Advertising: Believe It or Not, J. of Consumer Affairs, Vol. 36, No. 2, at 287 (Winter 2002) (noting that **"decades of research support the conclusion that advertised reference prices do indeed enhance consumers' perceptions of the value of the deal"** and further concluding that **"[c]onsumers are influenced by comparison prices even when the stated reference prices are implausibly high."**); Joan Lindsey-Mullikin & Ross D. Petty, Marketing Tactics Discouraging Price Search: Deception and Competition, 64 J. of Bus. Research 67 (January 2011) (concluding that **"[r]eference price ads strongly influence consumer perceptions of value"**); Praveen K. Kopalle & Joan Lindsey-Mullikin, The Impact of External Reference Price on Consumer Price Expectations, 79 J. of Retailing 225 (2003) (concluding that **"research has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value"** and **"have a significant impact on consumer purchasing decisions"**); Dr. Jerry B. Gotlieb & Dr. Cyndy Thomas Fitzgerald, An Investigation Into the

Effects of Advertised Reference Prices on the Price Consumers Are Willing to Pay for the Product, 6 J. of App'd Bus. Res. 1 (1990) (concluding that **"consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price"**).

40.     Where the comparison prices listed by the seller are genuine – where the buyer really is getting an item for a lower price than the one at which it is ordinarily sold – then the "bargain" promised in a seller's advertising may be real.

41.     Unfortunately, that is not the case here.

42.     In the case at bar, each item offered for sale by Defendants on their J. Crew Factory website is, and was during the class period, assigned a "valued at" price, which purports to be the "original" or "regular" price of that item.

43.     This "valued at" price is illusory, however, because no item on Defendants' website is ever sold, or even offered for sale, at the listed "valued at" price.

44.     Rather, each item is and always has been offered for sale at a price that is much lower than its assigned "valued at" price, pursuant to a continuously-running series of limited-time, site-wide "sales."

45.     These sales purport to discount, for a limited time only, all items on Defendants' website by some percentage or amount off the "valued at" prices.

46.     By way of example, Defendants will hold a limited-time "sale" where "EVERYTHING" on their website is advertised – by way of a brightly-colored banner at the top of their website page – to be "50% OFF." See Exhibit A, 4/12/2017 Printout from Defendants' website https://factory.jcrew.com, advertising a "50% OFF EVERYTHING" sale with "NO EXCLUSIONS."

47.     During such a sale, every item on Defendants' website will be offered for sale at a purportedly "discounted" price that is approximately equal to "50% OFF" the item's "valued at" price.

48.     Pursuant to the advertised sale, Defendants "strike through" the "valued at" price of each item and offer the item for sale a discounted or "sale" price, termed "your price."

49.     For example, during the above-described "50% OFF EVERYTHING" sale, Defendants offered a shirt for sale on its website as follows:

**valued at** ~~**$29.50**~~     *your price* **$14.99**

See Exhibit A, 4/12/2017 website printout, offering a Boys' Long-Sleeve Glow-In-The-Dark Paleontologist Storybook T-Shirt for $14.99 as part of the "50% OFF EVERYTHING" sale.

50.     Thus, Defendants represent to their customers that the "valued at" price is the "original" or "regular" price of the item offered for sale, and "your price" – the actual selling price – is a "sale" price that, pursuant to the sale, is discounted "50% OFF" the "valued at" price.

51.     Because the items on Defendants' website were never sold or offered for sale at their "valued at" prices, however, the items are not actually discounted by 50%, and thus the "50% OFF" discount advertised by Defendants is false and misleading.

52.     Indeed, the shirt identified above, offered for sale at a price of $14.99, was not even discounted by "50% OFF" its "valued at" price of $29.50, but rather was discounted only by 49%, as 50% off of $29.50 is $14.75.

53.     Moreover, Defendants will notify customers that the advertised sales and discounted prices are valid only for a limited time, such as from "April 12, 2017, 12:01 am ET through … April 16, 2017, 11:59 pm ET." See Exhibit A, 4/12/2017 Printout from Defendants' website https://factory.jcrew.com, advertising the limited time sale.

54.     Yet upon the expiration of that sale, Defendants will hold a different "sale" in which everything on their website is advertised to be, for example, "UP TO 50% OFF" for some period of time.

55.     Despite the differences in Defendants' characterization of the terms of each advertised sale, the actual prices of the items offered for sale on Defendants' website remain identical or substantially similar from sale to sale.

56.     Defendants follow each sale with another similar, albeit slightly different sale, which results in the same or a very similar "discounted" price for each item on Defendants' website.

57.     This series of successive sales continues *ad infinitum*, such that all of the items on Defendants website are always "on sale" and offered to the public at a purported discount, and moreover remain at identical or substantially similar prices every day.

58.     On the rare day when Defendants are not holding an advertised site-wide sale, but rather limit their advertised sale to a certain category of items – e.g., "UP TO 60% OFF NEW ARRIVALS" – they still do not offer any items for sale on their website at their fictitious "valued at" prices, but instead continue to offer all items for sale at prices that are substantially similar or identical to the items' purported "discounted" prices during a former site-wide "sale."

59.     For example, the above-described shirt, which was purportedly discounted to "$14.99" on Defendants' website during the advertised "50% OFF EVERYTHING" sale on April 12, 2017,  was also offered for sale at the identical price of "$14.99" during the immediately preceding sale (an "UP TO 50% OFF EVERYTHING" on April 10, 2017), as well as during the two sales prior to that (an advertised "UP TO 60% OFF NEW ARRIVALS" sale on April 7, 2017 and an advertised "EXTRA 50% OFF CLEARANCE" sale on March 31, 2017).

**Defendants' In-Store Sales Practices**

60.     As with their online sales, each item offered for sale by Defendants in their physical J. Crew Factory retail stores is, and was during the class period, assigned a price that is set forth on the item's price tag, which purports to be the "original" or "regular" price of the item.

61.     This in-store, ticketed price for each item is identical to the item's online "valued at" price.

62.     Like the online "valued at" price, the in-store ticketed price is illusory because no item in Defendants' retail stores is ever sold or offered for sale at the ticketed price.

63.     Rather, each item is and always has been offered for sale in Defendants' retail stores at a price that is much lower than its ticketed price, pursuant to a continuously-running series of limited-time, store-wide "sales."

64.     These sales purport to discount, for a limited time only, all items in Defendants' retail stores by a certain percentage or amount off the ticketed prices.

65.     Pursuant to an advertised in-store sale, Defendants display either the purported "sale" price or the percentage discount to be applied to the ticketed price on large placards prominently placed around the stores.

66.     For example, during an advertised "50% OFF EVERYTHING" sale on April 8, 2017, Defendants displayed the following placards throughout their retail stores:

**50%** OFF EVERYTHING

ALL MEN'S SHORTS TAKE **50%** OFF TICKETED PRICE

**50%** OFF TICKETED PRICE

See Exhibit B, collection of photographs taken at one of Defendants' J.Crew Factory retail stores on April 8, 2017.

13

67.     During the same sale, Defendants also displayed, for example, a large placard setting forth a sale price of "$29.95" above a rack of shirts with ticketed prices of "$59.50." See id.

68.     Thus, Defendants represent to their customers that the ticketed prices on their in-store items are the "original" or "regular" prices of those item, and the actual selling prices are "sale" prices that, pursuant to the advertised sale, are discounted "50% OFF" the ticketed prices.

69.     By way of example, during the above-described "50% OFF EVERYTHING" sale, Defendants advertised via placards that "everything" in their retail stores was on "sale" at prices that were discounted "50% OFF." See id.

70.     During this sale, Defendants offered for sale every item in their retail stores at "discounted" prices equal to approximately 50% off the items' ticketed prices. Thus, the shirt with a ticketed price of "$59.50" was offered at a sale price of "$29.95," which represents a 49.66% discount. See id.

71.     Because the items in Defendants' retail stores were never sold or offered for sale at their ticketed prices, however, the items were not actually discounted by 50%, and thus the "50% OFF" discounts advertised by Defendants are false and misleading.

72.     Moreover, Defendants will notify customers that the advertised sales and discounted prices are valid only for a limited time. Yet each "sale" will be followed immediately by a different "sale," which will result in the same or a very similar sale price for every item in Defendants' stores.

73.     Despite various differences in Defendants' specific characterization of the terms of each advertised sale, the actual prices of the items offered for sale in Defendants' retail stores remain identical or substantially similar from sale to sale.

74.     Defendants follow each sale with another similar, albeit slightly different sale, which results in the same or a very similar "discounted" price for each item in Defendants' stores.

75.     This series of successive sales continues *ad infinitum*, such that all of the items in Defendants' stores are always "on sale" and offered to the public at a purported discount, and moreover remain at identical or substantially similar prices every day.

*    *    *

76.     Thus, the items on Defendants' website and in Defendants' stores always were and continue to be either advertised as being "on sale" or offered for sale at prices lower than their "valued at" and/or ticketed prices.

77.     Moreover, all items on Defendants' website and in Defendants' stores always were and continue to be offered for sale to customers at the same or substantially similar prices, which Defendants advertise to be "sale" or "discounted" prices, regardless of the specific terms of the advertised sale in effect on that specific day.

78.     Because Defendants' purported sales and discounted prices never end, but rather continue on a daily basis and are available anytime a customer visits their website or retail stores, they are not actually sales or discounted prices at all, but rather constitute the everyday, regular prices of the items.

79.     The law recognizes the abuses that can flow from the use of fictitious comparison prices and phantom discounts off such prices, and consequently prohibits such practices.

80.     Specifically, Defendants' practices violate 16 C.F.R. § 233.1, which specifically prohibits the advertising of false, "phantom" price reductions and discounts off inflated, fictitious "regular" prices that never actually existed. *See id.*, stating:

## § 233.1  Former price comparisons.

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $___"), unless substantial sales at that price were actually made.

\*     \*     \*

(d) Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

(e) If the former price is set forth in the advertisement, whether accompanied or not by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless. It should be sufficiently large that the consumer, if he knew what it was, would

**believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.**

81.     In the case at bar, the "valued at" prices of the items on Defendants' website, and the ticketed prices of the items in Defendants' retail stores, are **"not bona fide but fictitious"** under 16 C.F.R. § 233.1 because the items were never sold or offered for sale at those "valued at" or ticketed prices for a **"reasonably substantial period of time."**

82.     Indeed, it is alleged that Defendants <u>never</u> sold or offered for sale any of the items on their J. Crew Factory website at their "valued at" prices, and never sold or offered for sale any of the items in their J. Crew Factory retail stores at their ticketed prices.

83.     Consequently, the purported **"reduced"** prices are **"in reality, ... [Defendants']  regular price[s]"** and **"the 'bargain[s]' being advertised"** by Defendants are **"false."** 16 C.F.R. § 233.1.

84.     What happened to Plaintiff Coladonato helps illustrate Defendants' unlawful practices described herein.

85.     Between 2015 and the present, Plaintiff made numerous purchases both from Defendants' J. Crew Factory website and from Defendants' physical J. Crew Factory retail stores.

86.     All of the items purchased by Plaintiff were advertised as being on sale, and were offered for sale by Defendants at purported discounts off their stated "valued at" and ticketed prices at the time Plaintiff purchased the items.

87.     None of the items purchased by Plaintiff were ever sold or offered for sale at their advertised "valued at" and ticketed prices, however; thus, the sales and discounted prices advertised by Defendants were illusory.

88.     For example, on or about February 22, 2015, Plaintiff purchased a 3" Chino Short, Item 36234 ("Chino Short"), from Defendants' J. Crew Factory website.

89.     The Chino Short was included in one of Defendants' site-wide sales, and was advertised to be discounted at least 40% off the "valued at" price of $34.50, at a purported sale price of $20.83.

90.     Plaintiff paid Defendants $20.83 for the Chino Short on February 22, 2015.

91.     The listed "valued at" price of $34.50 for the Chino Short purchased by Plaintiff was an unlawful fictitious former price under 16 C.F.R. § 233.1 because the Chino Short was not sold or offered for sale at that price for a reasonably substantial period of time.

92.     Indeed, the Chino Short was never sold or offered for sale at the "valued at" price of $34.50, but was always sold or offered for sale at a price approximately equal to – or less than – the purported discounted, "sale" price of $20.83 that Plaintiff paid for the item.

93.     In fact, according to the publicly-available price history of the Chino Short, it is most commonly offered for sale on Defendants' website at a price of $16.95.

94.     For example, the Chino Short was offered for sale on Defendants' website at a price of $16.95:  as part of a "30% OFF NEW ARRIVALS" sale on August 15, 2015; as part of a "50 STYLES UNDER $50" sale on January 31, 2016; as part of an "UP TO 60% OFF NEW ARRIVALS" sale on April 7, 2017; and as part of an "UP TO 50% OFF EVERYTHING" sale on April 10, 2017.

95.     Other sale prices for the Chino Short include a low of $14.95 (as part of a "50% OFF EVERYTHING" sale on April 12, 2017 and an "UP TO 60% OFF EVERYTHING" sale on June 1, 2017) to a high of $17.00 (as part of an "EXTRA 50% OFF CLEARANCE" sale on March 31, 2017).

96.     Thus, it is alleged that the regular, everyday price of the Chino Short is actually $16.95 rather than the asserted "valued at" price of $34.50.  Consequently, when Plaintiff purchased the Chino Short for $20.83, she was not getting the 40% discount claimed by Defendants, and indeed was not getting any discount at all.  Rather, she actually paid a price that was higher than the actual regular, everyday price of the item.

97.     Had the Chino Short actually been discounted by 40% off its regular, everyday price, as advertised by Defendants, Plaintiff would have been charged only $10.17 for the item.

98.     Then, on or about March 17, 2016, Plaintiff purchased a pair of Seaside Sandals, Item E8846 ("Seaside Sandals"), from Defendants' J. Crew Factory website.

99.     On that date, Defendants' website advertised an "UP TO 60% OFF EVERYTHING" sale in large letters on a brightly-colored banner across the top of the page.

100.    Defendants' website further represented that the sale was valid for a limited time only: "from March 17, 2016, 12:01am ET through March 21, 2016, 11:59 pm ET."

101.    Despite the "UP TO 60% OFF" representation on Defendants' website, the Seaside Sandals were offered for sale at a price of $35.50 – an approximate 40% discount off the assigned "valued at" price of $59.50.

102.    Plaintiff paid Defendants $35.50 for the Seaside Sandals on March 17, 2016.

103.    The listed "valued at" price of $59.50 for the Seaside Sandals purchased by Plaintiff was an unlawful fictitious former price under 16 C.F.R. § 233.1 because the Seaside Sandals were not sold or offered for sale at that price for a reasonably substantial period of time.

104.    Indeed, the Seaside Sandals were never sold or offered for sale at the "valued at" price of $59.50, but was always sold or offered for sale at a price approximately equal to – or less than – the purported discounted, "sale" price of $35.50 that Plaintiff paid for the item.

19

105.    In fact, according to the publicly-available price history of the Seaside Sandals, they are most commonly offered for sale on Defendants' website at a price of $24.99.

106.    For example, the Seaside Sandals were offered for sale on Defendants' website at a price of $24.99 during four consecutive "sales:" on March 31, 2017 as part of an "EXTRA 50% OFF CLEARANCE" sale; on April 7, 2017 as part of an "UP TO 60% OFF NEW ARRIVALS" sale; on April 10, 2017 as part of an "UP TO 50% OFF EVERYTHING" sale; and on April 12, 2017 as part of a "50% OFF EVERYTHING" sale.

107.    Thus, it is alleged that the regular, everyday price of the Seaside Sandals is actually $24.99 rather than the asserted "valued at" price of $59.50.  Consequently, when Plaintiff purchased the Seaside Sandals for $35.50, she was not getting the "UP TO 60% OFF" discount claimed by Defendants, and indeed was not getting any discount at all.  Rather, she actually paid a price that was <u>higher</u> than the actual regular, everyday price of the item.

108.    Had the Seaside Sandals actually been discounted by 60% off their regular, everyday price, as advertised by Defendants, Plaintiff would have been charged only $10.00 for the item.

109.    Moreover, the "UP TO 60% OFF EVERYTHING" advertisement, which was displayed on Defendants' J. Crew Factory website when Plaintiff purchased the Seaside Sandals on March 17, 2016, is contrary to New Jersey law, which prohibits retailers from advertising only the maximum percentage discount in connection with a sale, or to qualify such advertisement as "up to" this maximum percentage discount, without also stating the minimum percentage discount associated with the sale.  <u>See</u> N.J.A.C. § 13:45A-9.5(a)(1).

110.    Thereafter, on November 25, 2016, Plaintiff purchased two shirts from the J. Crew Factory retail store located in the Gloucester Premium Outlets in Blackwood, New Jersey.

111.    Both shirts were part of a storewide "Black Friday" sale, which Defendants advertised as a discount of "60% OFF EVERYTHING" via large in-store placards.  Defendants further represented that the sale was valid only for a limited time, through Sunday, November 27, 2016.

112.    The first shirt purchased by Plaintiff was a Boys' Long-Sleeve Glow-in-the-Dark Paleontologist Storybook T-Shirt, Item F9528 ("Paleontologist T-Shirt"), which was advertised via a large, brightly-colored, in-store placard to be discounted 60% off the ticketed price of $29.50, at a purported sale price of $11.80.

113.    The second was a Boys' Long-Sleeve Dino Storybook T-Shirt, Item F9526 ("Dino T-Shirt"), which also was advertised via a large, brightly-colored, in-store placard to be discounted 60% off the ticketed price of $32.50, at a purported sale price of $13.00.

114.    Plaintiff paid Defendants $11.80 for the Paleontologist T-Shirt and $13.00 for the Dino T-Shirt on November 25, 2016.

115.    Plaintiff's receipt confirmed that both shirts were represented by Defendants to be on sale at a discount of 60% off.  See Exhibit C, Plaintiff's receipt stating "Extra 60% Discount" off the ticketed prices of each shirt.

116.    The ticketed price of $29.50 for the Paleontologist T-Shirt purchased by Plaintiff was an unlawful fictitious former price under 16 C.F.R. § 233.1 because the Paleontologist T-Shirt was not sold or offered for sale at that price for a reasonably substantial period of time.

117.    Indeed, the Paleontologist T-Shirt was never sold or offered for sale at the ticketed price of $29.50, but was always sold or offered for sale at a price approximately equal to the purported discounted, "sale" price of $11.80 that Plaintiff paid for the item.

118.    In fact, according to the publicly-available price history of the Paleontologist T-

21

Shirt, it is most commonly offered for sale by Defendant at a price of $14.99.

119.    For example, the Paleontologist T-Shirt was offered for sale on Defendants' website at a price of $14.99 during four consecutive "sales:" on March 31, 2017 as part of an "EXTRA 50% OFF CLEARANCE" sale; on April 7, 2017 as part of an "UP TO 60% OFF NEW ARRIVALS" sale; on April 10, 2017 as part of an "UP TO 50% OFF EVERYTHING" sale; and on April 12, 2017 as part of a "50% OFF EVERYTHING" sale.

120.    Thus, it is alleged that the regular, everyday price of the Paleontologist T-Shirt is actually $14.99 rather than the asserted ticketed price of $29.50.  Consequently, when Plaintiff purchased the Paleontologist T-Shirt for $11.80, she was actually getting a discount of only approximately 21% off, rather than the 60% off discount claimed by Defendants.

121.    Had the Paleontologist T-Shirt actually been discounted by 60% off its regular, everyday price, as advertised by Defendants, Plaintiff would have been charged only $6.00 for the item.

122.    Similarly, the ticketed price of $32.50 for the Dino T-Shirt purchased by Plaintiff was an unlawful fictitious former price under 16 C.F.R. § 233.1 because the Dino T-Shirt was not sold or offered for sale at that price for a reasonably substantial period of time.

123.    Indeed, the Dino T-Shirt was never sold or offered for sale at the ticketed price of $29.50, but was always sold or offered for sale at a price approximately equal to the purported discounted, "sale" price of $13.00 that Plaintiff paid for the item.

124.    In fact, according to the publicly-available price history of the Dino T-Shirt, it is most commonly offered for sale by Defendant at a price of $14.99.

125.    For example, the Dino T-Shirt was offered for sale on Defendants' website at a price of $14.99 during four consecutive "sales:" on March 31, 2017 as part of an "EXTRA 50%

22

OFF CLEARANCE" sale; on April 7, 2017 as part of an "UP TO 60% OFF NEW ARRIVALS"
sale; on April 10, 2017 as part of an "UP TO 50% OFF EVERYTHING" sale; and on April 12,
2017 as part of a "50% OFF EVERYTHING" sale. The Dino T-Shirt was also offered for sale at
a price of $14.99 on June 1, 2017 as part of an "UP TO 60% OFF EVERYTHING" sale.

126.   Thus, it is alleged that the regular, everyday price of the Dino T-Shirt is actually
$14.99 rather than the asserted ticketed price of $32.50. Consequently, when Plaintiff purchased
the Dino T-Shirt for $13.00, she was actually getting a discount of only approximately 13% off,
rather than the 60% off discount claimed by Defendants.

127.   Had the Dino T-Shirt actually been discounted by 60% off its regular, everyday
price, as advertised by Defendants, Plaintiff would have been charged only $6.00 for the item.

128.   Accordingly, the "valued at" and ticketed prices assigned to each of the four above-
listed items that Plaintiff purchased, and upon which Defendants' advertised discounts were based,
were fictitious, as none of the items were sold at those "valued at" or ticketed prices for a
reasonably substantial period of time (if ever).

129.   Because the "valued at" and ticketed prices were false, the advertised discounts
allegedly applied by Defendants to Plaintiff's purchases were similarly false.

130.   Indeed, the two items that Plaintiff purchased online were not actually on sale or
discounted at all when Plaintiff purchased them, as represented by Defendants. Rather, the
purported "sale" price that Plaintiff paid for the items were actually higher than the items' regular,
everyday prices.

131.   Similarly, the two items that Plaintiff purchased in-store were actually discounted
far less than the 60% off claimed by Defendants.

132.    Notably, two of Defendants' "sales" highlighted above – the March 31, 2017 "EXTRA 50% OFF CLEARANCE" sale and the April 7, 2017 "UP TO 60% OFF NEW ARRIVALS" sale – did not directly apply to the Seaside Sandals, Paleontologist T-Shirt, and Dino T-Shirt purchased by Plaintiff, as none of the three items were identified either as "Clearance" items or "New Arrivals." Yet, during these two sales, Defendants offered the three items purchased by Plaintiff for sale at the **exact same prices** as they were offered for sale during the April 10, 2017 "UP TO 50% OFF EVERYTHING" sale and the April 12, 2017 "50% OFF EVERYTHING" sale – both which of clearly covered all three items.

133.    This further supports Plaintiff's allegations that Defendants' purported "sale" prices are not actually discounted at all, but rather are in fact the everyday, regular prices of the items offered for sale by Defendants on their website and in their retail stores.

134.    Defendants' misrepresentations about their limited-time sales, fictitious former prices, and significant discounts concerning the items purchased by Plaintiff were calculated and intended to, and did in fact, induce Plaintiff's purchases. Had Plaintiff known that the items she purchased were not on sale as advertised, but instead were being sold that their everyday regular prices – or at prices that were in fact higher than their everyday regular prices – she never would have purchased the items.

135.    Indeed, at the time Plaintiff purchased the Chino Short and Seaside Sandals from Defendants' website, she reasonably understood Defendants' use of the phrase "valued at" to be a representation of the actual price at which Defendants actually sold the items at some point in time, and that the difference between the purported "sale" price and the "valued at" price was a representation that she was being offered an actual percentage discount off the actual price at which Defendants had previously sold the items.

24

136.   Similarly, at the time Plaintiff purchased the Paleontologist and Dino T-Shirts from Defendants' retail store, she reasonably understood Defendants' ticketed price to be a representation of the actual price at which Defendants actually sold the items at some point in time, and that the difference between the purported "sale" price and the ticketed price was a representation that she was being offered an actual percentage discount off the actual price at which Defendants had previously sold the items.

137.   This was exactly the understanding that Defendants intended their actions to create in Plaintiff and the other class members, and the entirety of Defendants' actions was intended by Defendants to create such a misleading impression.

138.   What happened to Plaintiff was not an accident or an isolated incident.

139.   Rather, it was part of a uniform policy in which Defendants engaged in a systematic scheme of false and misleading advertising, marketing, and sales practices with the purpose of persuading customers to purchase items from Defendants' online J. Crew Factory website and physical J. Crew Factory retail stores.

140.   Defendants' specific unlawful practices include:

a.   Setting an arbitrary "valued at" price for every item on their website, and an arbitrary ticketed price for every item in their retail store, which prices purport to be each item's "original" or "regular" price, despite the fact that no item is or was ever sold or offered for sale at these prices;

b.   Continuously holding site- and store-wide sales that advertise and purport to offer items for sale at a specified percentage discount or amount off their "valued at" and ticketed prices, when the "discounted" sale prices do not actually represent the

advertised savings since the items were never offered for sale at the "valued at" and ticketed prices;

      c.      Representing that the sale prices are available only for a limited time, when each sale is followed by another similar sale offering the same items at same or substantially similar prices; and

      d.      Representing that items are on sale and offered at specified discounts and discounted prices when in fact the items are being offered for sale at their everyday, regular prices or discounts that are much lower than those advertised.

141.    As described herein, the "sale" prices advertised by Defendants are not actually discounted at all, but rather are the everyday, regular prices of the items.

142.    Indeed, Defendants' purported "discounts" described herein did not exist. Rather, Defendants always sold their items at, or very close to, the "discounted" price. As such, Defendants' allegedly reduced, "sale" price was, in fact, Defendants' regular price.

143.    To the extent Defendants ever provided any discount at all, the actual discount provided was far less than the advertised discount.

144.    These deceptive advertising, marketing, and sales practices were kept secret, and were affirmatively and fraudulent concealed from customers by Defendants throughout the class period. As a result, Plaintiff and her fellow J. Crew Factory website and retail store customers were unaware of Defendants' unlawful conduct alleged herein and did not know they were actually paying the everyday, regular prices for Defendants' products – or, at times, a higher price than Defendants' regular, everyday prices – rather than the advertised, purported discount prices.

145. Further, Plaintiff and her fellow J. Crew Factory website and retail store customers were unaware that they were not actually receiving the "% OFF" discounts advertised by Defendants, but rather were receiving only a fraction of that discount (if any at all).

146. Plaintiff and the class members did not discover, nor could they have discovered through reasonable diligence, that Defendants were violating the law until shortly before this litigation was initially commenced, because Defendants used methods to avoid detection and to conceal their violations of the law.

147. Defendants did not tell or otherwise inform Plaintiff or the class members that they were engaged in the deceptive advertising, marketing, and sales practices alleged herein. By their very nature, Defendants' unlawful practices were self-concealing.

148. In sum, Defendants induced Plaintiff and the class to purchase items from Defendants' online website and retail stores, for Defendants' profit, with the promise of sales and discounts that never existed. As a result of this unlawful, deceptive conduct, Plaintiff and the class have suffered damages set forth herein.

## CLASS ACTION ALLEGATIONS

149. **Class Definition:** Plaintiff brings this action as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking damages and injunctive relief under state consumer protection statutes and common law on behalf of herself and all members of the following proposed Class:

> **All United States citizens who purchased any item from Defendants' J. Crew Factory website or retail stores between June 6, 2011 and the present.**

150. **Sub-Class Definition:** Plaintiff brings this action as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking damages and injunctive

relief under state consumer protection statutes and common law on behalf of herself and all members of the following proposed Sub-Class:

> **All New Jersey citizens who purchased any item from Defendants' J. Crew Factory website or retail stores between June 6, 2011 and the present.**

151.    Each of the classes for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

152.    The exact number and identities of the persons who fit within each proposed class are contained in Defendants' records and can be easily ascertained from those records.

153.    The proposed class and subclass are each composed of at least 10,000 persons.

154.    Common questions of law and fact exist as to each class member.

155.    All claims in this action arise exclusively from uniform policies and procedures of Defendants as outlined herein.

156.    No violations alleged in this Complaint are a result of any individualized oral communications or individualized interaction of any kind between class members and Defendants or anyone else.

157.    There are common questions of law and fact affecting the rights of the class members, including, *inter alia*, the following:

    a.  whether the uniform advertising, marketing, and sales practices alleged herein exist;

    b.  whether Defendants ever sold items or offered items for sale at their assigned "valued at" and/or ticketed prices;

    c.  whether Defendants' claimed "% OFF" price reductions accurately depicted the actual discounts provided to customers;

    d.  whether Defendants' "sale" prices actually reflected the advertised savings;

    e.  whether Defendants' advertised sale prices were in fact available only for the advertised limited time;

f.  whether Defendants deceptively advertised everyday, regular prices of their items as "discount" or "sale" prices;

g.  the length of time Defendants engaged in the practices alleged herein;

h.  whether the alleged practices violated state consumer protection laws;

i.  whether the alleged practices constituted a breach of contract;

j.  whether the alleged practices constituted a breach of the implied covenant of good faith and fair dealing;

k.  whether the alleged practices constituted a breach of an express warranty;

l.  whether Defendants were unjustly enriched by the alleged practices;

m.  the nature and extent of the injury to the class and the measure of class-wide damages; and

n.  whether each class is entitled to injunctive relief in the form of an order directing Defendant to send a court-approved notice to all class members, advising the conduct alleged herein, as well as an order enjoining the conduct alleged herein and establishing a court-administered program to provide refunds of the overcharges to all such class members.

158.  Plaintiff is a member of the classes she seeks to represent.

159.  The claims of Plaintiff are not only typical of all class members, they are identical.

160.  All claims of Plaintiff and the classes arise from the same course of conduct, policy and procedures as outlined herein.

161.  All claims of Plaintiff and the classes are based on the exact same legal theories.

162.  Plaintiff seeks the same relief for herself as for every other class member.

163.  Plaintiff has no interest antagonistic to or in conflict with the classes.

164.  Plaintiff will thoroughly and adequately protect the interests of the classes, having retained qualified and competent legal counsel to represent herself and the classes.

165.  Defendant has acted and/or refused to act on grounds generally applicable to the classes, thereby making appropriate injunctive and declaratory relief for each class as a whole.

166.    Moreover, Plaintiff and each class has been subjected to the alleged unlawful policies complained of herein, and will be subjected to such policies in the future. Indeed, Plaintiff intends to purchase items from Defendants' J. Crew Factory website and retail stores in the future, and seeks to ensure that Defendants' "valued at" and ticketed prices represent actual, non-fictitious prices and that Defendants' advertised "% OFF" discounts represent actual sale prices.

167.    The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual members of each class, which would confront Defendant with incompatible standards of conduct.

168.    Adjudications with respect to individual members of the classes would as a practical matter be dispositive of the interests of other members not parties to the adjudications and would substantially impair or impede their ability to protect their interests.

169.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, inter alia, the damages suffered by each class member were not great enough to enable them to maintain separate suits against Defendants and in most, if not all, instances were less than $5,000 per person.

170.    Common questions will predominate, and there will be no unusual manageability issues.

171.    Without the proposed class action, Defendants will likely retain the benefit of their wrongdoing and will continue the complained-of practices, which will result in further damages to Plaintiff and class members.

## COUNT I

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW §§ 349 and 350
### (On Behalf of the Nationwide Class)

172.    Plaintiff realleges and incorporates by reference all previous paragraphs of this

Complaint as if set forth fully herein.

173.    Plaintiff brings this claim individually and on behalf of all other nationwide class members who purchased items from Defendants' website pursuant to New York Gen. Bus. Laws § 349 ("NYGBL § 349") and § 350 ("NYGBL § 350").

174.    Plaintiff specifically alleges that Defendants' advertising and marketing campaigns and their sales policies and practices relating to both their retail stores and website were created by Defendants at their principal place of business in New York, and were disseminated nationwide from New York.  Accordingly, the unlawful acts and practices alleged herein originated in New York, and Plaintiff alleges that  Defendants' marketing, advertising, and sale of merchandise from their retail stores and websites are governed by, inter alia, New York law, including NYGBL §§ 349 and 350, regardless of where in the United States the merchandise was purchased.

175.    NYGBL § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

176.    NYGBL § 350 makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York unlawful.

177.    Defendants' advertising, marketing, and sales practices, as set out more fully above, were deceptive and false in violation of NYGBL §§ 349 and 350 in that they:

      a.  Set and advertised an arbitrary "valued at" price for every item on their website, and an identical arbitrary ticketed price for every item in their retail stores, which prices were represented to be the items' "original" or "regular" prices despite the fact that no item was ever sold or offered for sale at that price;

      b.  Continuously held site- and store-wide "sales" that purported to offer items for sale at a specified percentage discount or amount off their "valued at" and ticketed prices, when the "discounted" sale prices did not actually represent the advertised savings since the items were never offered for sale at the "valued at" and ticketed prices;

      c.  Represented that the sale prices were available only for a limited time, when each sale was immediately followed by another, similar sale offering the same

items at same or substantially similar prices;

d. Represented that items were on sale and offered at discounted prices when in fact the items were being offered for sale at their everyday, regular prices (or at prices that were higher than their everyday, regular prices); and

e. Charged their customers the full, regular price for the items sold rather than the advertised sale or discounted price.

178.     These deceptive advertising, marketing, and sales practices originated from and were performed at Defendants' headquarters in New York, and therefore were the products of "business, trade or commerce" in New York.  Indeed, Defendants operate their J. Crew Factory website out of their headquarters in New York; thus, all of the advertising and sale of items on or from Defendants' website occurred in New York.

179.     Plaintiff seeks to enjoin these unlawful, deceptive practices on behalf of herself and the nationwide class.

180.     As described herein, there was a causal connection between Defendants' deceptive conduct and the injuries to Plaintiff and the nationwide class.

181.     Plaintiff and each nationwide class member were intended victims of Defendants' deceptive conduct alleged herein.

182.     Plaintiff and each nationwide class member were injured in fact and lost money as a result of Defendants' deceptive conduct.

183.     Plaintiff and each nationwide class member have been deprived of the benefit of their bargain, which is a valid measure of loss under New York law, in that they received something less than what was advertised on Defendants' website – Defendants represented that Plaintiff and the class were paying a sale price, discounted by an advertised percentage, for the items they purchased, when in fact they were not receiving the advertised discount, and in many instances were paying the everyday, regular price (or an even higher price) for the items they

purchased.

184.   Plaintiff and each nationwide class member believed Defendants' misrepresentations that the items they purchased were in fact on sale and being offered at the advertised discounted prices, and would not have purchased such items had they known that Defendants' advertisements were false.

185.   Moreover, the Court can presume such reliance under the circumstances of the case at bar, because the false statements regarding the prices of the items were placed by Defendants on their website and in their retail stores for the purpose of inducing the purchase of such items, as part of a course of conduct intended to deceive Plaintiff and the class members.

186.   Consequently, the conduct of Defendants as alleged herein constitutes deceptive acts and practices in violation of NYGBL § 349, and Defendants are liable to Plaintiff and each nationwide class member for not less than $50.00 per person.

187.   The conduct of Defendants as alleged herein also constitutes false advertising in violation of NYGBL § 350, and Defendants are liable to Plaintiff and each nationwide class member for not less than $500.00 per person.

188.   Plaintiff and the nationwide class seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendants from continuing to disseminate its false and misleading statements and conduct the aforementioned practices, and for other relief allowable under NYGBL §§ 349 and 350.

<u>COUNT II</u>

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J.S.A. 56:8-1, <u>et</u> <u>seq</u>.**
**(On Behalf of the New Jersey Subclass)**

189.    Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

190.    Plaintiff brings this claim individually and on behalf of all other New Jersey Subclass members who were customers of Defendants' J. Crew Factory website and retail stores.

191.    The New Jersey Supreme Court has repeatedly held that the New Jersey Consumer Fraud Act ("NJCFA") must be construed liberally in favor of the consumer in order to accomplish its deterrent and protective purposes.  See Furst v. Einstein Moomjy, 182 N.J. 1, 11-12 (2004) (**"The Consumer Fraud Act is remedial legislation that we construe liberally to accomplish its broad purpose of safeguarding the public."**).

192.    Indeed, the courts of New Jersey have repeatedly held that  the NJCFA is intended to be one of the strongest consumer protection statutes in the nation.  See New Mea Const. Corp. v. Harper, 203 N.J. Super. 315, 319 (App. Div. 1986) (**"[t]he available legislative history demonstrates that the Act was intended to be one of the strongest consumer protection laws in the nation."**)

193.    As stated by the New Jersey Appellate Division in Dugan v. TGI Friday's, Inc., 2011 WL 5041391 at *3 (App. Div. 2011):

> **Celebrated as "one of the strongest consumer protection laws in the nation," the CFA has been propagated by an uninterrupted history "of constant expansion of consumer protection." (citations omitted)**

194.    The NJCFA prohibits not only a list of specifically enumerated acts, but also any

unconscionable or deceptive commercial practice. As stated by the New Jersey Supreme Court in

Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011):

> **Because the "fertility" of the human mind to invent "new schemes of fraud is so great," the CFA does not attempt to enumerate every prohibited practice, for to do so would "severely retard[ ] its broad remedial power to root out fraud in its myriad, nefarious manifestations." Thus, to counteract newly devised stratagems undermining the integrity of the marketplace, "[t]he history of the [CFA] [has been] one of constant expansion of consumer protection." (citations omitted) (emphasis added)**

195.     As held by the District of New Jersey in Katz v. Live Nation, C.A. No. 09-3740

(D.N.J. 2010):

> **We find that Defendants err in their assertion that New Jersey law does not recognize a stand-alone claim for unconscionable commercial practice....NJCFA claims for unconscionable commercial practice need not allege an affirmative fraudulent statement, representation, or omission by the defendant.**

196.     The CFA does not require a plaintiff to plead or prove any intent to defraud. Indeed,

the CFA has been held to prohibit sharp or unfair practices, even if the defendant acts in good

faith. See Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 12 (2004):

> **The Consumer Fraud Act is remedial legislation that we construe liberally to accomplish its broad purpose of safeguarding the public. The Act protects consumers from more than just "shifty, fast-talking and deceptive merchant[s]" and "sharp practices and dealings...." It also protects consumers from unfair practices "even when, a merchant acts in good faith." (emphasis added)**

197.     The CFA does not require a plaintiff to plead or prove "reliance" or even a

fraudulent act.  Rather, the plain language of N.J.S.A. § 56:8-2 states that any deceptive and

unconscionable commercial practice violates the CFA, even if there is no actual fraud and even if

no one has actually been misled or deceived by the practice. See Skeer v. EMK Motors, Inc., 187

N.J. Super. 465, 470 (App. Div. 1982):

> **Violation of the act can be shown even though a consumer has not in fact been misled or deceived. N.J.S.A. § 56:8-2. <u>It is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited.</u> (emphasis added)**

198.    An "unconscionable commercial practice" is not limited to false statements of fact or fraud. <u>Cowger v. Cherry Hill Mitsubishi, Inc.</u>, No. A-3408-09T4, 2011 N.J. Super. Unpub. LEXIS 620, at *10 (Super. Ct. App. Div. Mar. 14, 2011) (**"Lost in that dust-up is the fact that the CFA not only prohibits fraud and misrepresentations but unconscionable commercial practices as well."**)

199.    Rather, the NJCFA recognizes a "stand alone" violation, even in the absence of conduct which would constitute common law fraud, called an "unconscionable commercial practice."

200.    As with every other aspect of the CFA, the meaning of the term "unconscionable commercial practice" in N.J.S.A. § 56: 8-2 must be broadly defined.  This catch-all term was added to the CFA by amendment in 1971 to ensure that the Act covered **"exorbitant prices, unfair bargaining advantages and incomplete disclosures."**  <u>Skeer v. EMK Motors, Inc.</u>, 187 N.J. Super. 465, 472 (App. Div. 1982).

201.    In describing what constitutes an "unconscionable commercial practice," the New Jersey Supreme Court has noted that it is an amorphous concept designed to establish a broad business ethic.  <u>See</u> <u>Cox v. Sears Roebuck & Co.</u>, 138 N.J. 2, 18 (N.J. 1994).  As stated by the District of New Jersey in <u>Pollitt v. DRS Towing, LLC</u>, 2011 WL 1466378 at *7 (D.N.J. 2011):

> **The New Jersey Supreme Court has stated that 'unconscionability' is an amorphous concept obviously designed to establish a broad business ethic.**

202.    As a matter of law, the CFA <u>does</u> <u>not</u> require a plaintiff to request a refund from

the seller, and the availability of a refund does not negate a CFA claim.  Rather the New Jersey

Supreme Court has specifically rejected both arguments, holding that to allow the availability of a

refund to nullify a CFA claim would create a "safe harbor" for misconduct by merchants and would

be contrary to the purpose of the CFA.  See Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 561

(2009):

> **Plainly, if we require plaintiffs, as a precondition to filing a complaint
> under the CFA, to first demand a refund, we will create a safe harbor
> for an offending merchant. A merchant could rely on the pre-suit refund
> demand requirement, boldly imposing inflated charges at no risk, and
> planning to refund the overcharges only when asked. Such an analysis of
> the CFA would limit relief by making it available only to those
> consumers who are alert enough to ask for a refund, while allowing the
> offending merchant to reap a windfall….Because reading a pre-suit
> demand for refund requirement into the CFA would thwart those
> salutary purposes, we will not endorse it.**

203.    Moreover, the fact that a merchant has offered a refund after suit has been filed

does not negate a CFA claim.  Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 6 (2004).

204.    By the acts alleged herein, Defendants have committed multiple acts that

constitute unconscionable commercial practices under N.J.S.A. § 56:8-2 of the NJCFA.

Specifically, Defendants:

> a.  Set and advertised an arbitrary "valued at" price for every item on their website,
> and an identical arbitrary ticketed price for every item in their retail stores,
> which prices were represented to be the items' "original" or "regular" prices
> despite the fact that no item was ever sold or offered for sale at that price;
>
> b.  Continuously held site- and store-wide "sales" that purported to offer items for
> sale at a specified percentage discount or amount off their "valued at" and
> ticketed prices, when the "discounted" sale prices did not actually represent the
> advertised savings since the items were never offered for sale at the "valued at"
> and ticketed prices;
>
> c.  Represented that the sale prices were available only for a limited time, when
> each sale was immediately followed by another, similar sale offering the same
> items at same or substantially similar prices;
>
> d.  Represented that items were on sale and offered at discounted prices when in

fact the items were being offered for sale at their everyday, regular prices (or at prices that were higher than their everyday, regular prices); and

e.  Charged their customers the full, regular price for the items sold rather than the advertised sale or discounted price.

205.    In addition, Defendants made written affirmative misrepresentations of fact in the sale of goods, which is an unlawful practice under the plain language of N.J.S.A. § 56:8-2.

206.    Specifically, Defendants' website and in-store placards advertised that Plaintiff was purchasing items at a specific percentage discount (e.g., "60%") off their "valued at" and ticketed prices, and that the discounted prices were valid only for a limited time.

207.    As indicated previously, neither of these statements of fact were true.  The items were not discounted to the extent claimed by Defendants, as they were never sold at their "valued at" and ticketed prices.  Rather, the items were being sold to Plaintiff at a price equal to (or much closer or even higher than) the everyday price at which Defendants regularly sold those items. Moreover, the purportedly discounted prices did not end as advertised by Defendants, but rather continued indefinitely.

208.    In addition, Defendants engaged in knowing, material omissions of fact that constitute unlawful practices under the plain language of N.J.S.A. § 56:8-2.

209.    Defendants were aware that, without some explanation of the phrase "valued at," consumers would naturally assume that the "valued at" prices set forth on their website were real prices at which Defendants had actually sold the items at some point in time.

210.    Similarly, Defendants were aware that, without additional explanation, consumers would assume that the ticketed prices set forth on items' in-store price tags were real prices at which Defendants had actually sold the items at some point in time.

211.    Despite this, Defendants failed to advise Plaintiff and the New Jersey Subclass that the "valued at" and ticketed prices were not prices at which Defendants had ever sold the items in

question.

212.    Nor did Defendants advise Plaintiff and the New Jersey Subclass that the items offered for sale on their website and in their retail stores were not actually sold at the advertised discounts, and in many instances were not discounted at all, but rather were being sold by Defendants at or close to their everyday, regular prices.

213.    Moreover, because Defendant's conduct described herein is a violation of 16 C.F.R. § 233.1, such conduct constitutes a per se violation of the CFA, N.J.S.A. § 56:8-1, et seq.

214.    Furthermore, Defendants' practices, as alleged in greater detail herein, violate several New Jersey regulations promulgated under the NJCFA.  Under well-established law, such regulatory violations constitute per se violations of the NJCFA.

215.    Specifically, the conduct of Defendants, as described herein, violates N.J.A.C. § 13:45A-9.6(a), which states: **"An advertiser shall not use a fictitious former price. Use of a fictitious former price will be deemed to be a violation of the Consumer Fraud Act."**

216.    In addition, Defendants' use of "valued at" and ticketed prices is a deceptive representation in violation of N.J.A.C. § 13:45A-9.6(b)(1).  This regulation requires that Defendants be able to substantiate that there were **"a substantial number of sales of the advertised merchandise, or comparable merchandise of like grade or quality made within the advertiser's trade area in the regular course of business at any time within the most recent 60 days..."**

217.    Defendants cannot do this. As alleged herein, Defendants' "valued at" and ticketed prices were and are completely arbitrary statements of fictitious prices invented by Defendants, designed to induce customers into erroneously believing they were buying discounted merchandise at prices significantly less than what the items were objectively worth and/or being sold for.

Defendants' "valued at" and ticketed prices were <u>not</u> based on any actual prices at which comparable merchandise was actually sold in New Jersey in the regular course of business by anyone within the last 60 days, as required by N.J.A.C. § 13:45A-9.6(b)(1).

218.    Likewise, Defendants' use of "valued at" and ticketed prices is a deceptive representation in violation of N.J.A.C. § 13:45A-9.6(b)(2). This regulation requires that Defendants substantiate **"That the advertised merchandise, or comparable merchandise of like grade or quality, was actively and openly offered for sale at that price within the advertiser's trade area in the regular course of business during at least 28 days of the most recent 90 days before or after the effective date of the advertisement..."**

219.    Again, Defendants cannot do this. Defendants' "valued at" and ticketed prices were <u>not</u> based on any actual price at which comparable merchandise was actually sold in New Jersey in the regular course of business by anyone within 28 of the last 90 days, as required by N.J.A.C. § 13:45A-9.6(b)(2).

220.    Indeed, Defendants' practices violate the illustrations of prohibited practices listed in N.J.A.C. § 13:45A-9.6, which specifically states it is a violation of this regulation for an advertiser to use terms such as **"retail value"** for a product, when the purported **"retail value"** price listed is not based on the prevailing, representative price actually being charged in the area where the consumer is shopping. <u>See</u> N.J.A.C. § 13:45A-9.6, noting **"the advertisement of 'Retail Value $ 15.00' would suggest a prevailing, and not merely an isolated and unrepresentative price in the area in which they shop."**

221.    In addition, Defendants' practices, as alleged herein, violate N.J.A.C. § 13:45A-9.3, which requires that a sale advertisement state specifically and accurately the time period during which the sale price is applicable. As indicated herein, Defendants advertised that their

"sales" were available only for a limited time, e.g., "from March 17, 2016, 12:01am ET through March 21, 2016, 11:59 pm ET." Yet Defendants were fully aware when they made these statements, that the purported expiration time and date listed on their advertisements were false. For example, Defendants knew that the advertised discounts associated with the purported "UP TO 60% OFF EVERYTHING" sale, during which Plaintiff purchased the Seaside Sandals, were not ending at midnight on March 17, 2016, and the Seaside Sandals would continue to be offered for sale by Defendants at the same or very similar price charged to Plaintiff for a substantial time thereafter.

222.    Finally, the "UP TO 60% OFF EVERYTHING" advertisement, which was displayed on Defendants' J. Crew Factory website when Plaintiff purchased the Seaside Sandals on March 17, 2016, is a violation of N.J.A.C. § 13:45A-9.5(a)(1), which prohibits retailers from advertising only the maximum percentage discount in connection with a sale, or to qualify such advertisement as "up to" this maximum percentage discount, without also stating the minimum percentage discount associated with the sale.

223.    These uniform practices by Defendants constitute unlawful, sharp and unconscionable commercial practices relating to the sale of goods in violation of the NJCFA, N.J.S.A. § 56:8-1, et seq.

224.    As alleged herein, Defendant has engaged in deceptive conduct which creates a likelihood of confusion or misunderstanding.

225.    As such, Defendants have acted with knowledge that its conduct was deceptive and with intent that such conduct deceive purchasers.

226.    Plaintiff and the class members reasonably and justifiably expected Defendants to comply with applicable law, but Defendants failed to do so.

227.    As a direct and proximate result of these unlawful actions by Defendants, Plaintiff and the New Jersey Subclass have been injured and have suffered an ascertainable loss of money, in that they failed to receive the full benefit of the bargain promised by Defendants.

228.    That loss is measured, inter alia, by the loss of the specific percentage discount that Defendants promised, but did not deliver, on each of Plaintiff's and the New Jersey Subclass's purchases.  In actuality, Plaintiff and the New Jersey Subclass received a much lesser discount – or no discount at all – and the prices they paid for the items they purchased were the regular, undiscounted prices normally charged by Defendants, or very close thereto.

229.    The purported discounts offered by Defendants were illusory because their purported existence was premised on Defendants' misleading representations that Defendants were offering these items for sale at a discounted price that was lower than the actual price at which the items were regularly sold.

230.    Under New Jersey law, the presumptive value of an item is its regular selling price.

231.    By listing "valued at" prices on their website and in-store price tags, Defendants promised bargains to Plaintiff and the class in which they would receive items that were in fact worth the advertised "valued at" prices.  However, Plaintiff and the class did not receive the benefit of that promised bargain because the items were never sold at their "valued at" prices, and thus were not actually worth the advertised "valued at" prices, but rather were worth less than those prices.  By receiving items worth less than their promised value, Plaintiff and the class were deprived of the benefit of the promised bargain.

232.    Plaintiff and the class also suffered an out of pocket loss of money in that they were induced to pay money to purchase items based on Defendants' deceptive and misleading marketing

policies described herein. But for Defendants' deceptive and misleading conduct, Plaintiff and the class would not have purchased the items from Defendants.

233.  Thus, Plaintiff's damages arising from her four purchases referenced herein may be measured in three ways. First, because Plaintiff would not have purchased any of the four items but for Defendants' misrepresentation that they were on sale, Plaintiff should be entitled to a full refund of what she paid for the items – $20.83 for the Chino Short, $35.50 for the Seaside Sandals, $11.80 for the Paleontologist T-Shirt, and $13.00 for the Dino T-Shirt. Alternatively, Plaintiff should receive the difference between her purchase price for each item and the amount she would have paid had the promised discount been applied to each item's regular price – $10.66 for the Chino Short ($20.83 purchase price less $10.17, which is 40% off the actual regular price of $16.95); $25.50 for the Seaside Sandals ($35.50 purchase price less $10.00, which is 60% off the actual regular price of $24.99); $5.80 for the Paleontologist T-Shirt ($11.80 purchase price less $6.00, which is 60% off the actual regular price of $14.99); and $7.00 for the Dino T-Shirt ($13.00 purchase price less $6.00, which is 60% off the regular price of $14.99). At the absolute minimum, Plaintiff should receive a refund of the amounts she overpaid for the Chino Short ($2.28) and Seaside Sandals ($10.51) – the difference between the price she paid and each item's actual regular price – as those items were not discounted at all when Plaintiff purchased them, as advertised by Defendants, but rather were sold to Plaintiff at price higher than their everyday regular prices. The actual damages of the class could be similarly calculated from Defendants' records.

234.  Pursuant to N.J.S.A. 56:8-19 of the NJCFA, Plaintiff seeks, inter alia, actual damages, treble damages and injunctive relief for herself and the class.

## COUNT III

### VIOLATION OF THE NEW JERSEY TRUTH IN CONSUMER CONTRACT, WARRANTY AND NOTICE ACT, N.J.S.A. § 56:12-14, et seq.
### (On Behalf of the New Jersey Subclass)

235.    Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

236.    Plaintiff brings this claim individually and on behalf of all other New Jersey Subclass members who were customers of Defendants' J. Crew Factory website and retail stores.

237.    Plaintiff and the New Jersey Subclass are "consumers" within the meaning of N.J.S.A. §§ 56:12-15 and 16.

238.    Defendants are "sellers" within the meaning of N.J.S.A. §§ 56:12-15 and 16.

239.    The advertisements and representations on Defendants' website and posted on in-store placards, stating, e.g., that items are on "sale" and being discounted by certain percentages or amounts, are both a consumer "notice" and "warranty" within the meaning of N.J.S.A. §§ 56:12-15 and 16.

240.    By the acts alleged herein, Defendants have violated N.J.S.A. § 56:12-16 because, in the course of Defendants' business, Defendants have offered written consumer notices and warranties to Plaintiff and the New Jersey Subclass which contained provisions that violated their clearly established legal rights under state law and federal regulations, within the meaning of N.J.S.A. § 56:12-15.

241.    Specifically, the clearly established rights of Plaintiff and the New Jersey Subclass under state law include the right not to be subjected to unconscionable commercial practices, omissions of material fact, and false written affirmative statements of fact in the sale of goods, as described herein, which acts are prohibited by the NJCFA, N.J.S.A. § 56:8-2.

44

242.     Further, the clearly established rights of Plaintiff and the New Jersey Subclass under federal law include the right not to be subjected to false advertising in violation of 16 C.F.R. § 233.1.

243.     Moreover, the clearly established rights of Plaintiff and the New Jersey Subclass include the right not to be subjected to advertising practices prohibited by N.J.A.C. § 13:45A-9.6, N.J.A.C. § 13:45A-9.3, and N.J.A.C. § 13:45A-9.5(a)(1).

244.     Pursuant to N.J.S.A. § 56:12-17, Plaintiff seeks a statutory penalty of $100 for each New Jersey Subclass member, as well as actual damages and attorneys' fees and costs.

### COUNT IV

### BREACH OF CONTRACT
**(On Behalf of the Nationwide Class and New Jersey Subclass)**

245.     Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

246.     Plaintiff and the class members entered into contracts with Defendants.

247.     The contracts provided that Plaintiff and the class members would pay Defendants for their products.

248.     The contracts further provided that Defendants would provide Plaintiff and the class members a specific discount on the price of their purchases.  This specified discount was a specific and material term of each contract.

249.     Plaintiff and the class members paid Defendants for the products they purchased, and satisfied all other conditions of the contracts.

250.     Defendants breached the contracts with Plaintiff and the class members by failing to comply with the material term of providing the promised discount, and instead charged Plaintiff and the class members a higher, or full, price of the products they purchased.

45

251.    As a direct and proximate result of Defendants' breach, Plaintiff and the class members have been injured and have suffered actual damages in an amount to be established at trial.

## COUNT V

## BREACH OF CONTRACT UNDER THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (On Behalf of the Nationwide Class and New Jersey Subclass)

252.    Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

253.    There was no written contract between Defendants and their customers, including Plaintiff and the class members.

254.    Rather, by operation of the law of each state, there existed an implied contract for the sale of goods between each customer who purchased items from Defendants' J. Crew Factory website and retail stores.

255.    By operation of the law of each state, there also existed an implied duty of good faith and fair dealing in each such contract.

256.    By the acts alleged herein, Defendants have violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

257.    Specifically, it was a violation of the duty of good faith and fair dealing for Defendants to represent that the items on their website were discounted by a specific percentage or amount when in fact they were not discounted at all, or by a far lesser percentage, but instead were offered for sale at their regular prices (or at a price very close thereto).

258.    It was also a violation of the duty of good faith and fair dealing for Defendants to charge Plaintiff and class members prices that were higher than promised by Defendants' advertised percentage off discounts, and that were in many cases the regular prices for the items

46

purchased by Plaintiff and the class.

259.    As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and the class members have been injured and have suffered actual damages in an amount to be established at trial.

**COUNT VI**

**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class and New Jersey Subclass)**

260.    Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

261.    Plaintiff and the class members formed contracts with Defendants at the time they purchased items from Defendants' website and retail stores.  The terms of such contracts included the promises and affirmations of fact made by Defendants through their marketing campaigns, as alleged herein, including, but not limited to, representing that the items for sale on Defendants' J. Crew Factory website and retail stores were being discounted.

262.    This product advertising constitutes express warranties, became part of the basis of the bargain, and is part of the contracts between Defendants and Plaintiff and the class members.

263.    The affirmations of fact made by Defendants were made to induce Plaintiff and the class members to purchase items from Defendants' website and retail stores.

264.    Defendants intended that Plaintiff and the class members would rely on those representations in making their purchases, and Plaintiff and the class members did so.

265.    All conditions precedent to Defendants' liability under these express warranties have been fulfilled by Plaintiff and the class members in terms of paying for the goods at issue, or have been waived.  Defendants had actual and/or constructive notice of their own false advertising, marketing, and sales practices but to date have taken no action to remedy their

breaches of express warranty.

266.    Defendants breached the terms of the express warranty because the items purchased by Plaintiff and the class members did not conform to the description provided by Defendants – that they were being sold at a specified discount.  In fact, they were not.

267.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and the class members have been injured and have suffered actual damages in an amount to be established at trial.

## COUNT VII

### UNJUST ENRICHMENT
### (On Behalf of the Nationwide Class and New Jersey Subclass)

268.    Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

269.    This claim is asserted in the alternative to a finding of breach of contract.  This claim asserts that it is unjust to allow Defendants to retain profits from their deceptive, misleading, and unlawful conduct alleged herein.

270.    Plaintiff and the class were charged by – and paid – Defendants for the items they purchased from Defendants' website and retail stores.  Consequently, Plaintiffs and the Class have conferred substantial benefits on Defendants by purchasing the items, and Defendants have knowingly and willingly accepted and enjoyed these benefits.

271.    Defendants represented that these items were discounted by a certain percentage or amount, with the specific intent that such representation would induce customers to purchase said items.

272.    As detailed herein, the items purchased by Plaintiff and the class members were not discounted to the extent claimed by Defendants, and in some cases were not discounted at all.

273.    Because the items were advertised as being discounted when they actually were not, Defendants collected more money than they would have if the items were discounted as promised.

274.    As a result of these complained-of actions by Defendants, Defendants received benefits under circumstances where it would be unjust for them to retain those benefits.

275.    Defendants have knowledge or an appreciation of the benefit conferred upon them by Plaintiff and the class members.

276.    Equity demands disgorgement of Defendants' ill-gotten gains.  Defendants will be unjustly enriched unless Defendants are ordered to disgorge those profits for the benefit of Plaintiff and the class members.

277.    Plaintiff and the class members are entitled to restitution and/or disgorgement of all profits, benefits, and other compensation obtained and retained by the Defendants from their deceptive, misleading, and unlawful conduct described herein.

## COUNT VIII

### NEGLIGENT MISREPRESENTATION
**(On Behalf of the Nationwide Class and the New Jersey Subclass)**

278.    Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

279.    Defendants have negligently represented that the items offered for sale on their J. Crew Factory website and in their J. Crew Factory retail stores are discounted by a specific percentage, when in fact they are not.

280.    This is a material fact that Defendants have misrepresented to the public, including Plaintiff and the Class Members.

49

281.    Defendants know that the prices of the items offered for sale on their website and in their retail stores – and specifically whether such prices are discounted or sale prices – are material to the reasonable consumer, and Defendants intend for consumers to rely upon such misstatements when choosing to purchase items from their website and retail stores.

282.    Defendants knew or should have known that these misstatements or omissions would materially affect Plaintiff's and the class members' decisions to purchase items from Defendants.

283.    Plaintiff and other reasonable consumers, including the class members, reasonably relied on Defendants' representations set forth herein, and, in reliance thereon, purchased items from Defendants' website and retail stores.

284.    The reliance by Plaintiff and the class members was reasonable and justified in that Defendants appeared to be, and represented themselves to be, a reputable business.

285.    Plaintiff and the class members would not have been willing to pay for the items they purchased, or would not have paid what they paid for the items they purchased, if they knew that such items were not in fact discounted by the advertised percentages from their everyday, regular prices.

286.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff and the class members were induced to purchase items from Defendants' website and retail stores, and have suffered damages to be determined at trial, in that, among other things, they have been deprived of the benefit of their bargain in that they bought items that were purported to be discounted by a specified percentage, when in fact they were not.

287.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered in favor of Plaintiff and the class against Defendants as follows:

A.   Enter an order certifying the proposed Class, designating Plaintiffs as the Class representatives, and designating the undersigned as Class counsel;

B.   Declare that Defendants are financially responsible for notifying all Class members of their deceptive advertising, sales, and marketing practices alleged herein;

C.   Declare that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits they received from their deceptive advertising, sales, and marketing practices alleged herein, or order Defendants to make full restitution to Plaintiffs and the members of the Class;

D.   Find that Defendants' conduct alleged herein be adjudged and decreed in violation of the state laws cited above;

E.   Grant economic and compensatory damages on behalf of Plaintiff and all members of the Class, to the maximum extent permitted by applicable law;

F.   Grant punitive or exemplary damages as permitted by law;

G.   Grant the requested injunctive and declaratory relief;

H.   Award interest as permitted by law;

I.   Grant reasonable attorneys' fees and reimbursement all costs incurred in the prosecution of this action; and

J.   Grant such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure. Plaintiff. on behalf of himself and all others similarly situated. demands a trial by jury on all questions of fact raised by the complaint.

Date:   June 6, 2017

DeNITTIS OSEFCHEN PRINCE, P.C.

By:   _____
Ross H. Schmierer, Esq.  – RS7215
5 Greentree Centre
525 Route 73 North. Suite 410
Marlton, NJ 08053
Tel.: (856) 797-9951
Fax: (856) 797-9978

*Attorneys for Plaintiff and
the Putative Class*

1